We'll hear argument next in number 081041, Wuxi Multimedia Ltd. against KoninKlijke Philips Electronics NV. Why don't we wait, Mr. Handel, just a moment for the room to clear and get yourself ready at the lectern. Thank you, Your Honors. Anton Handel, H-A-N-D-A-L, Handel & Associates on behalf of Appellant Wuxi, etc. Thank you for your patience. I know it's been a long morning and it struck me that the Court's on top of all of these things, so I thought first I would inquire if there are any questions or any areas you want me to focus on in my 10 minutes. I think you can go ahead and just assume that we understand the factual predicate to the argument and go to the arguments you think you want most pointedly to call to our attention. Thank you. And I will not belabor the record with a repeat of the factual background. I think I have to acknowledge initially that the end zone has moved on me since we initially filed the pleading and had hearings on the motion on the 12B6. I think the Supreme Court has clearly articulated in Bell Atlantic what the standard is for pleading in antitrust cases, which I have to acknowledge is different than we had initially prepared for, pled for, and argued in the 12B6. I think there's a heightened, the law is clear now that there's a heightened pleading requirement as it relates to these antitrust cases. So I think on the basis of that I'm a little bit of a disadvantage, my client's a little bit of a disadvantage because we entered the game at a time when the rules were a little different. Happened to the plaintiff in Bell Atlantic too. Pardon me? Happened to the plaintiff in Bell Atlantic. I know how that plaintiff feels. I think in the interest of justice, a second swipe at the pinata should be afforded at repleading simply because the bar has been risen. But be that as it may, I still think that there is ample factual pleading in the complaint suffice to overcome the limitations of Bell Atlantic. The complaint is long, it states a lot of material, and I think the court, the district court grappled a little bit with a lot of the pleading and a lot of what appeared to the court to be inconsistent pleading. There was statements in the Second Amendment complaint that the production of DVD players and importation in the United States of DVD players was on the rise. That the price of DVD players was falling. Well, that's a normal progression when competitors are coming into a market that appears to be lucrative. What the complaint was articulating was that the patent pooling arrangement that the 3C group employed had the risk of eliminating competitors, limiting output, and causing prices to increase. By applying this level of cost that was not a part of the manufacturing cost, but was the license fee. Here's my basic problem in this area, and perhaps you can address this. A lot of the arguments here about the anti-competitive effects of the practices that are involved are just the anti-competitive effects of a patent system. I mean, if somebody's got a patent, that person has the power to limit the market dramatically, assuming that there aren't any ways readily available to go around the patent, including to make the market dry up entirely. Those are anti-competitive effects, but we tolerate them because we think the patent system provides other advantages. How does this patent pool give the defendants powers that they did not have pursuant to their patents in the first place? Yes, thank you for the question. As a practitioner, I respect the fact that a patent is an accepted monopoly within a space of a technology or an invention. The problem here is that when you have a group of companies come together that also set the standards, they can then define how a system, and that's what this is. This is a system. This is not talking about a product or a device or invention that would warm a fluid in a laboratory. We're talking about a system that is comprised of a number of different components that ultimately creates a finished product, and we're talking about a DVD player here. The risk is that if they corner the standard and the technology, then they begin to dictate to the consumer and manufacturers and people who want to participate in the business how they should participate in the business. Now, if I was going to plead this complaint again today, I would be able to say with some clarity that the production of DVD players has declined since this complaint was filed, that the prices of DVD players in the open market has gone up and has stabilized at a price in the $30 to $40 price range when they were at the $19 price range back when the complaint was filed. I'd also say that let's take a look at what happened in the high-definition format, which is called out in the complaint that Blu-ray and Toshiba's standard of HD DVD, Toshiba just abandoned it, just walked away from it. Well, why? Well, they were part of this big consortium initially. Was there some understanding where they would agree how to move forward into the next evolution of laser disc technology? Coupled on top of that is the troublesome fact that there are several content providers who are intertwined with the group. Warner Brothers, for example. Sony has Sony BMG content, music, and movies. Philips was related to Polygram. These are all called out in the complaint. And what we've seen is that the accumulation and the combination has driven a business. The patents, we're not talking about one patent, we're talking about over 100 patents, have developed, evolved around a business practice. And that's where the problem is. It's not about the patents. It's about the business practice. It's about the anti-competitive behavior to corner a business model, which is the delivery of content in a digital format via these players. And the development and the evolution of technology around that product, around that business model. And I think that's the problem. It goes beyond simply a patent by patent analysis. You have to look at it in the aggregate from the 30,000 foot level. And I think that Judge Sobraw focused too closely on the concept that what we're talking about here is just patents. And he expected in the complaint that we would call out which patents are non-essential. Well, at the time we didn't really know. But if I was going to plead this today, I would say that those patents in the pool that relate to their AC-3 technology, AC-3 being audio compression level three technology, are non-essential. Well, why does that matter? I mean, suppose that there is, I don't know the answer to this, but suppose there's one patent that is a dominant patent here without which no one can enter the market or without a license to which no one can enter the market. So what if they decide we're only going to license one patent and it's at $20 per unit or we'll give you the rest of the patents for free? Why is that a violation of any antitrust principle? The way you articulated it, that is not a violation of antitrust principle. Okay, and what is done here that's materially different from that with respect to non-essential patents? Thank you. What is done here is that no one of them has a single dominant patent. They each have corners of the standard. But when I say dominant, I mean that without a license to which you couldn't enter the market. I assume that there are some patents that you need to have in order to enter this market. Yes, there are. So assume that is the case and assume that they charge, they put all the freight in terms of the license on those patents and they say, you know what, we're giving you the rest of them for free because we're so nice. What's wrong with that? I think I have a problem with that in that they come together to do that instead of being competitors against one another to battle each other out to determine whether the claims of each one of their patents are solid, stable enough to support, to challenge each other's patents. They don't. They don't because it's easier for them to put them together and charge everybody else that's on the outside a fee, whether it's $20, $100, or $5. And that's where the complaint talks about or talks in terms of suppressing competition between them for the delivery of better technologies. It's what we saw with the Toshiba HD DVD standard. Toshiba just walked away from the standard. But you have to show some form of bad intent and there's an obvious commercial neutral reason and maybe a good for the market as well for them to do this. A bunch of people holding patents. They don't ally themselves to one another. So somebody puts a DVD on the market and it lasts for a short period of time and there's a suit. And then there's another suit. And then it's 10 years before DVDs are available, before we iron out all the patent differences between them. There's a perfectly obvious legal reason why they would patent pool so that they can get the product on the market and benefit all of them. And that has nothing to do with intent to monopolize. And the problem with your complaint is, and it was a problem I think that existed before Twombly, is you don't allege anything that makes it even the slightest bit more probable that it's an intent to monopolize rather than an intent to get a product to the market without tons of patent litigation, which as everyone knows today is a significant problem. That's what my concern. Okay. Thank you for the clarification. And we are talking about allegations. I don't mean to argue my case here. This is not a closing argument. But it would seem to me that these facts go toward establishing an intent to monopolize. This group sits on a standard-setting body that articulate the standards for the direction of the industry. They then have and acquire and develop patents within the standard or set standards around the patents that they have, disrespecting or leaving out other legitimate, reasonable alternatives, such as the e-DVD, the extended DVD standard or technology that was being developed at the time that is now nonexistent because it didn't fit exactly within the standard. Then they go out and they license each other for free. They don't pay each other royalties on these products because then they enter the market and compete with people who are not part of the group on better-priced terms because they don't pay royalty because they're part of the select group. Then they go out and they establish relationships, license agreements, at multiple levels of the production. The IC level, the OPU, which is the optical disc manufacturer. The assembler, the manufacturer, who we see is a member of the assembler tier. Then they go out and they license brand holders with the right to use these same groups of patents. So they're patenting or they're licensing and controlling at each one of these levels. The discrete provision within their agreement, their standard agreement, is that you can't buy or sell any product related to this except to somebody else that's licensed under our plan. Well, Jed Sebraw kind of went right by that, but I don't think he saw that that was part of the rope around the group that pulled them all together. I think that establishes at least an intent to control, a monopolistic intent to have their hand in every aspect of the DVD industry from the laboratory to the living room where the customer puts a disc in and plays it. And not just that, the technology is beyond. And that's where the risk is because they're so ingrained that there's no room for other technology to evolve. You're well into your rebuttal time, Mr. Handel. We'll reserve your rebuttal time. Why don't we hear from the other side now? Mr. Kowalski. Thank you, Your Honor. Thank you very much, Your Honor. I'll try to be brief and address only the arguments that Mr. Handel has raised during his argument this morning. His first argument is that the end zone has moved as a result of Twombly and that he should be given an opportunity to replete in light of that. And I think that the answer is quite clear. That's simply not the case. In Twombly itself, the court, in retiring the Conley v. Gibson standard, observed that most of the lower courts had already moved away from that standard. This court, in its decision in McZeel, noted that Twombly had not changed the pleading standard under Rule 8. And Judge Dyke, in his dissenting opinion there, noted that the courts had already, for a long time, been requiring that a complaint be supported by more than conclusory allegations. And then finally, and perhaps most important, the law in the Ninth Circuit, which is the controlling law with respect to pleading standards in this case, has been clear at least since 1988, that's 20 years now, that in order to state a claim under the antitrust laws, the plaintiff must outline the antitrust violation with a supporting factual detail. And the Ninth Circuit reaffirmed that this last March in its decision in Kendall, applying Twombly and holding that an antitrust complaint had to be supported with allegations of evidentiary fact. Mr. Handel's second argument this morning is that what's really objectionable here is not the pooling of patents, but the business practices and that these companies set the standard. Well, the courts, most recently the D.C. Circuit in its Rambis decision, have long recognized that standard setting can also be very pro-competitive because it helps to promote interoperability. The pro-competitive nature of standard setting and patent pools couldn't be more obvious from the facts alleged by Mr. Handel himself in his complaint here, namely that this pool has licensed hundreds of manufacturers of DVDs, that the industry has grown dramatically over the 10 years since the patent pool was created, and that prices have dropped dramatically from more than $100 to less than $30. Third, Mr. Handel says, well, but that's changing now. Since my complaint was dismissed, the growth of the industry has slowed down, prices are going up. Well, of course, supply and demand changes all the time. That's the way markets work. In any event, those are all new facts. They're not alleged in the complaint, and there's certainly no reason for reversing the district court's dismissal of this complaint. Last two points, Your Honor. Mr. Handel says that what's really objectionable here is not just the creation of the patent pool, but the fact that the members of the pool licensed each other for free, while, of course, the grant of the license itself is valuable consideration. So when someone grants a license in return for a license from someone else, that's not granting a license for free. And then finally, he says, the further objection he has is that under the license agreement, a licensee can't buy or sell to anyone who's not licensed under our plan, and that constitutes an act of monopolization. Fortunately, we have the terms of the license agreement in front of us. The district court relied on it. It's a license agreement that was submitted by the plaintiff itself to the district court. And if you turn to Joint Appendix A251, you see that what... You see that what the license agreement actually says in paragraph 3.2 is that licensee shall refrain from purchase or selling DVD players manufactured by any third party not licensed by Phillips. And here's the key language. Where such purchase or sale would constitute an act of infringement of any of the licensed patents. Licensees are only being asked to agree not to infringe the patents they're licensing. Let me just close very quickly by focusing for just a moment on what we view as the key part of the district court's opinion of Mr. Handel's case. And that's this allegation that somehow a patent pool is a price-fixing conspiracy. There again, I think the case law is very clear, your honors, that patent pools serve pro-competitive purposes. They help to reduce transactions costs. They help to reduce uncertainty. The members of the pool actually have an incentive to license at lower rates, lower royalties, than the individual members of the pool would have an incentive to license but for the pool. For all of those reasons, the Supreme Court in Broadcast Music, which involved a copyright pool, held that copyright pools and by extension patent pools are not per se unlawful price-fixing mechanisms. First of all, they don't fix the price of individual patents. Instead, they offer a new product, a package license to all of the patents in the pool that no individual member could offer. And second, as I've already said, they're not a naked restraint of trade because they help to provide pro-competitive benefits through lower royalties, less uncertainty, lower transactions costs. So, in order to state a claim under the antitrust laws involving a patent pool, at a minimum, Mr. Handel would have to allege facts showing harm to competition. That's been the law in the Ninth Circuit for at least 20 years. There are no facts in this complaint alleging any harm to competition. At most, it alleges harm to one or two competitors where there are hundreds of competitors in a market, in a vibrant competitive market. Thank you, Your Honor. Unless you have questions? Thank you. Mr. Handel? Just briefly, Your Honor, and I'll try to just address the points that were raised. In the Kendall case, the court noted in the last section, and unfortunately I don't have the official, so I think it's at page 151, the court noted that normally we would agree that when the Supreme Court alters the pleading requirements for a cause of action, such as it did in Bell Atlantic, plaintiffs should be allowed leave to amend their complaint to meet the new standard. Granted, this is dicta, but it is in the notion of fair play. In our case, it's different than Kendall because in Kendall, they did a significant discovery. We did no discovery in this case to flesh out issues of intent or other issues. The issue in broadcast music, broadcast music didn't hold that pools of intellectual property do not violate Section 1 or 2 of the Sherman Act. It held that under the analysis of the facts in that case, under a rule of reason, the program that was presented didn't infringe the Sherman Act. But what's important here is that the plaintiffs were allowed their day in court. We alleged essentially the same type of Sherman Act violations, a combination of intellectual properties coming together to be sold as a package which created a new product. The facts in our case, I think, are significantly different than those in broadcast music, and we should be afforded the same opportunity as the plaintiffs in broadcast music. The one thing I don't understand is about the bite at the apple is you filed this. Was this filed as a class action? A putative class action, yes. Okay. Was it a first filer? We had the first filer in the country? Yes. Okay. My concern is, just purely on equitable grounds, you file this complaint, you're a first filer of a class action, and you can tell, I think, from the initial rulings of the court that the district judge didn't think a lot of your complaint. Right. And the question is, under those circumstances, why would you have not thrown in the kitchen sink and given absolutely everything you had? What were you withholding, and why were you withholding it under those circumstances? Well, the biggest obstacle is obviously Rule 11. As a practitioner for over 25 years, we don't just throw things in that we don't think we can prove. Since the case had been filed, I've been involved in other litigation involving Phillips. I have come to see certain things related to their practices. Under protective orders in those cases, I can't include them, I can't discuss them, but I believe now that given the facts and information that has been available and can be available in discovery, that there will be more, more on the issue of this cross-licensing. I mean, there is cross-licensing. I think that's come out publicly, that they don't pay each other royalties, that they have this relationship not only between themselves, but between the 6C group. And I think it's this cross-licensing, this incestuous relationship between the members of the standard-setting body that really is the most offensive to the claims, to the Sherman Act. That's what's really at the gravum of this. It's not that we are attacking the right of a scientist or a developer of technology to protect his invention. It's just that what you do with it afterwards needs to be in conformance with community standards. Thank you. Thank you. Thank you both, counsel. The case is submitted. All rise. Thank you. Thank you. Good seeing you again. Thank you. The Honorable Court has heard Professor Marlow's opinion. Thank you.